# Exhibit D



ENERGY TRANSFER

Energy Transfer Equity, L.P.
3738 Oak Lawn Avenue
Dallas, TX 75219
(214) 981-0700
(214) 981-0706 (FAX)

April 29, 2013

Dear Jamie,

We are pleased to extend this invitation to you to join Energy Transfer Equity, L.P ("ETE"). This letter, along with the attached document referencing your initial ETE Unit Award agreement and ETE 2008 Long Term Incentive Plan contains our complete offer of employment to you.

Effective immediately, you will join ETE as Group Financial Officer and Head of Corporate Development. Your official start date will be June 24, 2013. You will report directly and solely to me. As part of your responsibilities with ETE, the Chief Financial Officers for Energy Transfer Partners, L.P., Regency Energy Partners and Sunoco Logistics Partners, L.P. (the "Controlled Entities"), will report to you, as well as business/corporate development personnel at the above defined Controlled Entities. In addition, you will be appointed as a Board Member of ETE, and each of the Controlled Entities.

Your annual salary will be $550,000.00, subject to applicable withholdings and subject to any future adjustment. You also will be eligible to participate in our short-term and long-term incentive plans.

To be eligible for a bonus under our short-term incentive plan, you must be on payroll on the day bonuses are paid, except as provided below. Bonus awards under that plan are discretionary and are based on company and individual performance; provided, however, that you will receive a guaranteed minimum cash bonus for 2013 of $550,000.00, which will be paid on the same date that incentive cash bonuses are paid to other senior executives at the Controlled Entities, but in any event not later than March 15, 2014.

Effective as of the date hereof, you will be awarded 750,000 units of ETE under ETE's 2008 Long Term Incentive Plan, subject to the vesting conditions of the attached document. Any additional long-term incentive awards are discretionary and are based on company and individual performance.

Finally, we understand and agree that you and your family currently intend to reside in London, though ETE has its headquarters in Dallas, Texas. You will commute between London and Dallas (or other offices of ETE or the Controlled Entities) and the parties agree that with respect to your employment with ETE, Dallas will be your principal office. ETE will cover the reasonable expenses of such commuting and will make

April 29, 2013
Page 2 of 3

monthly payments to you equivalent to the amounts you currently receive pursuant to your international assignment letter with Credit Suisse dated October 2012 (a copy of which is attached) for the remainder of the term of that letter. ETE will also cover the reasonable expenses for you to maintain a small serviced office in London with appropriate support assistance.

You will be eligible to participate in our benefit programs. Information about these programs is included in the "Energy Transfer Partners 2013 Enrollment Guide" that we provided to you. Your employment is "at will," which means that ETE or you may terminate your employment at any time for any reason.

Upon termination of your employment for any reason, ETE will pay you any salary and expenses owed to you through the date of termination. If your employment is terminated due to your death or disability, or if your employment is terminated by ETE without cause or you resign for Good Reason, ETE also will pay you (or your estate) the following (if not already paid): (i) your 2013 bonus, (ii) after 2013, any pro-rated short-term incentive award for the number of days worked during the year of termination (iii) will vest all unvested equity awards (including but not limited to your initial award of 750,000 ETE units). For these purposes, Cause and Good Reason will have the meanings set forth in the attached Award Agreement. For the avoidance of doubt, in the event of a termination by ETE for Cause or a voluntary termination by you without Good Reason all unvested equity awards shall be immediately forfeited.

The terms contained in this letter are conditional upon your being entitled to live and work legally in the United States. In order to verify employment eligibility, we ask that you provide adequate documentation stating your identity according to the Immigration and Naturalization Service employment eligibility requirements (I-9 Form).

As a condition of your employment with us, we want to make sure that you understand our position regarding confidential information that you may have acquired from any prior employer. ETE prohibits you from bringing to work or otherwise utilizing any confidential information or trade secrets, whether in written or electronic form, that you obtained from any prior employer. Just as ETE will expect you to protect its confidential information and trade secrets, you should not use any confidential information acquired from other businesses or created by you while working for any prior employer in connection with your work with ETE.

We consider the terms of this employment offer to be confidential, proprietary and the property of ETE. Please do not share any details of this offer with anyone except your immediate family and any financial or legal advisors that you require to evaluate the offer. ETE agrees to reimburse the reasonable costs of your legal advisors in reviewing, revising, and negotiating this offer and any ancillary documents and agreements. We ask that you please sign and return this letter within 5 business days of receipt.

April 29, 2013
Page 3 of 3

Jamie, we are very enthusiastic about your joining ETE and look forward to a mutually
rewarding working relationship. We look forward to offering you opportunities that
challenge and reward you.

Sincerely,

Kelcy Warren
Chief Executive Officer of ETE

Accepted:

_____
Jamie Welch

**Subject:  Unit Award Under [2008] Long Term Incentive Plan**

We are extremely pleased to inform you that the Compensation Committee of the Board of Directors of ETE Equity, L.P. ("*ETE*") has granted you an Award representing rights to receive 750,000 common units under the ETE Equity, L.P. [2008] Long Term Incentive Plan (the *"Unit Plan"*) This Award is subject to vesting as follows: 30% on the second anniversary of this Award; 35% on the fifth anniversary of this Award; and the remaining 35% on the seventh anniversary of this Award. Such vesting is subject to your continued employment with ETE on each such vesting date.  Any portion of this Award that does not vest will be forfeited.  This Award entitles you to receive a cash payment equal to the cash distribution per common unit made by ETE on its outstanding common units, effective as of the date of execution of this award by both parties, in each case promptly following each such distribution made by ETE.   This Award is subject to the terms and conditions of the Unit Plan.  In the event of any inconsistency between this Award or the Unit Plan, this Award shall prevail.

Please note that, like any compensation arrangement, Awards under the Unit Plan are to be kept confidential unless required to be disclosed by SEC disclosure regulations.

Thanks for your continuing contribution to our efforts.  It is a pleasure for us to be associated with you in building an even greater company.

Award Date: April 29, 2013

Kelcy Warren

Chairman of the Board

**ENERGY TRANSFER EQUITY, L.P.
[2008] LONG-TERM INCENTIVE PLAN**

**Time-Vested Restricted Unit Agreement**

This Restricted Unit Agreement (the "Agreement"), is entered into on the date of acceptance by the Participant and is made by and between Energy Transfer Equity, L.P. (the "Partnership") and the accepting Participant.

**Recitals:**

WHEREAS, the Partnership maintains the Energy Transfer Equity, L.P. [2008] Long-Term Incentive Plan (the "Plan"), which is administered by the Compensation Committee of the Board of Directors of the general partner of the Partnership (the "Committee"); and

WHEREAS, the Committee has determined to make an award to the Participant of 750,000 Restricted Units, representing rights to receive common units, representing limited partnership interests in the Partnership, subject to a risk of forfeiture pursuant to the terms and conditions of the Plan; and

WHEREAS, the Participant has determined to accept such award;

NOW, THEREFORE, the Partnership and the Participant, each intending to be legally bound hereby, agree as follows:

**ARTICLE I:**

**Award of Restricted Units**

**1.1 Award.** Subject to the terms and conditions of the Plan and this Agreement, the Participant is hereby granted the number of Restricted Units specified (the "Award") to vest as follows:

    Vesting Schedule:

    30% on the second anniversary of the Award;

    35% on the fifth anniversary of the Award; and

    35% on the seventh anniversary of the Award.

This Award includes tandem Distribution Equivalent Rights ("DERs"), which entitles the Participant to receive with respect to each Restricted Unit subject to this Award an amount in cash equal to the cash distribution per common unit made by the Partnership on its outstanding common units, during the period such Award is outstanding, with such payment being made promptly following each such distribution made by the Partnership, provided however that for these purposes the Participant shall receive cash payments as if the Award had been made as of January 1, 2013.

**1.2 Effect of Plan; Construction.** The entire text of the Plan is expressly incorporated herein by this reference and so forms a part of this Agreement. In the event of any inconsistency or discrepancy between the provisions of this Agreement and the Plan, the provisions in this Agreement shall govern and prevail. This Agreement is subject in all respects to the terms and conditions of the Plan, as the same may have been amended from time to time in accordance with its terms; *provided, however,* that no such amendment shall deprive the Participant, without such Participant's consent, of any rights earned or otherwise due to Participant hereunder. Initially capitalized terms and phrases used in this Agreement but not otherwise defined herein, shall have the respective meanings ascribed to them in the Plan.

**1.3 Vesting/Payments.** This Award is subject to vesting as described above and such vesting is subject to the Participant's continued employment with the Partnership or its subsidiary or affiliate on each vesting date, except as provided in Article 1.4 of this Agreement.

(a) Payment of DERs. The Participant will be entitled to receive, with respect to each common unit subject to the Award described above that has not either vested or been forfeited, a cash payment equal to the cash distribution per common unit made by the Partnership on its outstanding common units, in each case promptly following each such distribution made by the Partnership, provided that the cash payment for the first quarter of 2013 will be made within 30 days after the Award Date.

(b) Tax Withholding. All unit vestings and distributions under this Agreement are subject to withholding of applicable taxes as determined by the Partnership in good faith. Immediately prior to vesting or payment of any Units in respect of an earned Award, the Participant must satisfy applicable withholding taxes due upon the receipt of such Units.

(i) *Payment in Units.* Participant may elect to satisfy such withholding obligations by surrender of a number of Units sufficient to satisfy such withholding obligations based on the Fair Market Value, determined by the arithmetic average of the closing prices for the ten trading days immediately prior to the applicable vesting date of the Units surrendered, otherwise payable to Participant in respect of such earned Award.

(ii) *Payment in Cash.* Cash payments in respect of any earned Award, and/or tandem DERs, shall be made net of any applicable withholding taxes.

**1.4 Termination of Employment.**

(a) Death, or Permanent Disability. No portion of this Award shall be forfeited as a result of the occurrence, prior to the end of the Restricted Period, of the Participant's death, or termination of employment by reason of Disability. Instead, in the event of such death, or Disability, this Award shall fully vest.

(b) Retirement. The Award granted hereunder is for the express purpose of retaining the employment services and engagement of the Participant for the full time of the Restricted Period. Except as provided in Sections 1.4(a), (d) or (f), the unvested portion of this Award shall be forfeited as a result of the termination of the Participant's employment with the Partnership or its subsidiary of affiliate by reason of retirement prior to the end of the Restricted Period, and Participant shall not be entitled to any payment of Units or DERs on account of this Award for the period after the retirement date.

(c) <u>Leaves of Absence.</u>  The Committee shall determine whether any voluntary leave of absence taken by the Participant constitutes a termination of employment within the meaning of the Plan, and the impact of such leave of absence on awards made to Participant under the Plan.

(d) <u>Change of Control</u>.  At the time of consummation of a Change of Control, as defined in the Plan, all unvested Units shall vest immediately.

(e) <u>Termination with Cause or Voluntarily.   If the Participant's employment is terminated for Cause (as defined below) by the Partnership or voluntarily (without Good Reason) by the Participant, the unvested units will be immediately forfeited.</u>   For these purposes, "Cause" shall mean termination because of Participant's (i) conviction (treating a nolo contendere plea as a conviction) of a felony (whether or not any right to appeal has been or may be exercised), (ii) willful refusal without proper cause to perform his duties (other than any such refusal resulting from incapacity due to physical or mental impairment), (iii) misappropriation, embezzlement or reckless or willful destruction of employer's property, (iv) knowing breach of any statutory or common law duty of loyalty to the employer, (v)  improper conduct materially prejudicial to the business of the employer, or (vi) material breach by Participant of the offer letter dated [April 22], 2013 from ETE to you ("Offer Letter").  With respect to termination to the Partnership for Cause pursuant to subsections (ii) or (vi) above, the Partnership shall give written notice to Participant specifying in detail  the conduct that allegedly constitutes grounds to terminate for Cause and shall provide Participant thirty (30) days after receipt of such notice to cure such grounds, if curable.  For the avoidance of doubt, termination for Cause under subsections (i), (iii), (iv) or (v) cannot be cured by the Participant and no such notice to cure shall be delivered.

(f) <u>Termination without Cause or for Good Reason</u>.  If Participant's employment is terminated by the Partnership (or any Affiliate or agent of the Partnership) without Cause or is terminated by the Participant for Good Reason, then all unvested Units shall vest immediately.  For these purposes, "Good Reason" shall mean termination by Participant due to (i) a material diminution in Participant's duties, responsibilities, authority, title, reporting line, or compensation, or (ii) material breach by the Partnership of the Offer Letter.  With respect to termination by Participant for Good Reason pursuant to this section Participant shall give written notice to the Partnership specifying in detail the conduct or item that allegedly constitutes grounds to resign for Good Reason and shall provide the Partnership thirty (30) days after receipt of such notice to determine if Good Reason exists and/or  to cure such asserted Good Reason.

**ARTICLE II**

**General Provisions**

**2.1** <u>Successors and Assignability.</u> This Agreement shall be binding upon, and inure to the benefit of, the Partnership and its successors and assigns, and upon any person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Partnership's assets and business. Unless otherwise provided by the Committee: (a) no part of this Award until vested shall be assignable or transferable by the Participant, except by will or the laws of descent and distribution; and (b) during the Participant's life, this Award shall be payable only to the securities account in the joint names of the Participant and Fiona Angelini held at Credit Suisse or as directed by the Participant and Fiona Angelini

jointly in writing. In the event of the Participant's death, payment, to the extent permitted by this Agreement and the Plan, shall be made to the Participant's estate. Notwithstanding anything to the contrary herein, Participant may assign, for estate or financial planning purposes, some or all of his interests under this Award to or for the benefit of members of his family.

**2.2 Rights as a Limited Partner.** Until Units have been validly issued (as fully paid common units representing limited partnership interests in the Partnership) to the Participant or any other person, neither Participant nor such other person shall be entitled to any privileges of Unit ownership, or otherwise have any rights as a limited partner, by reason of the Award.

**2.3 Amendment.** This Agreement shall not be amended or modified except by an instrument in writing executed by both parties hereto.

**2.4 Captions.** The captions at the beginning of each of the numbered Sections and Articles herein are for reference purposes only and will have no legal force or effect. Such captions will not be considered a part of this Agreement for purposes of interpreting, construing or applying this Agreement and will not define, limit, extend, explain or describe the scope or extent of this Agreement or any of its terms and conditions.

**2.5 Governing Law.** THE VALIDITY, CONSTRUCTION, INTERPRETATION AND EFFECT OF THIS INSTRUMENT SHALL BE GOVERNED EXCLUSIVELY BY, AND DETERMINED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF), EXCEPT TO THE EXTENT PRE-EMPTED BY FEDERAL LAW, WHICH SHALL GOVERN. THE PARTNERSHIP AND THE PARTICIPANT IRREVOCABLY CONCSET AND AGREE THAT JURISDICTION FOR ANY DISPUTE UNDER THIS AGREEMENT SHALL BE ESTABLISHED IN THE STATE AND FEDERAL COURTS SITUATE IN DALLAS COUNTY TEXAS.

**2.6 Notices.** Communications shall be addressed and directed to the parties, as follows, or to such other address or recipient for a party as may be hereafter notified by such party hereunder:

(a) If to the Partnership:  Energy Transfer Equity, L.P., 3738 Oak Lawn Ave., Dallas, Texas  75219, Attn: General Counsel

Notices to the Partnership shall be deemed to have been duly given or made upon actual receipt by the Partnership.

(b) If to the Participant:  to the address for Participant as it appears on the Partnership's records, with a copy to Wayne N. Outten, Esq, Outten & Golden LP, 3 Park Avenue, New York, NY 10016.

**2.7 Severability.** If any provision hereof is found by a court of competent jurisdiction to be prohibited or unenforceable, it shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision to the extent it is not prohibited or unenforceable, nor invalidate the other provisions hereof.

**2.8 Entire Agreement.** This Agreement constitutes the entire understanding and supersedes any and all other agreements, oral or written, between the parties hereto, in respect of the subject matter of this

Agreement and embodies the entire understanding of the parties with respect to the subject matter hereof.

Award Date:  April 29, 2013

Energy Transfer Equity, L.P.

By: _Kelcy Warren_

Kelcy Warren, Chief Executive Officer

Jamie Welch, Participant



**CREDIT SUISSE**

CREDIT SUISSE SECURITIES (USA) LLC
Eleven Madison Avenue
New York, NY 10010-3629

Direct    1 212 325 20
www.credit-suisse.com

4 October 2012

Mr Jamie Welch

**SUPPLEMENTARY AGREEMENT TO YOUR EMPLOYMENT CONTRACT WITH CREDIT SUISSE SECURITIES (USA) LLC**

Dear Mr. Welch,

**Long Term Assignment**

We are pleased to confirm the following agreement.

| | |
|---|---|
| Home location: | New York, New York, United States of America |
| Host location: | London, United Kingdom |
| Division: | IBD |
| Employing entity: | Credit Suisse Securities (USA) LLC (the "Employer" or "CS") |
| Host entity: | Credit Suisse Securities (Europe) Limited (the "Host") |
| Corporate title at commencement of Assignment: | Managing Director |
| Base salary at commencement of Assignment: | USD 450,000 |
| Start date: | 1 September 2012 (contingent upon receiving the necessary work permit/visa, where applicable, and any required approval from regulatory and other authorities) |
| Estimated End Date: | 31 August 2014 (this may be shortened at the Employer's discretion and based on the needs of the business, but it cannot be extended or renewed) |

The Long Term Assignment Program of the Employer dated January 2011 (the "LTA Program", as amended from time to time), is an integral part of this Supplementary Agreement. The allowances, benefits and relocation assistance that will be provided by CS in relation to this Long Term Assignment, together with your personal obligations, are described in this Supplementary Agreement and the LTA Program. If the terms of this Supplementary Agreement and the LTA Program conflict, the terms of this Supplementary Agreement shall prevail.

Page 1 of 11

Pg. 42

CREDIT SUISSE

The allowances, benefits and levels of assistance which are provided to you in connection with your Long Term Assignment ("Assignment") are provided at the discretion of CS and, as such, CS reserves the right to amend their terms, or to discontinue them or your participation in them, at its sole discretion at any time. Any extension of your assignment may be on different terms from those explained in this agreement.

Your Assignment will commence on 1 September 2012, and is intended to continue until the Estimated End Date referred to above. However, the terms of your Assignment may be shortened at any time at the Employer's discretion and based upon its business needs and those of the Host. Please note that CS will not extend the terms of your assignment as detailed in this agreement past the above outlined two years. If it has not ended earlier, your Assignment will end concurrently upon the termination of your employment with the Employer.

Please note that the relocation provisions and ongoing assignment allowances, deductions and provisions contained in this Supplementary Agreement will not continue under any circumstances after two years. If you have any international assignment whatsoever, of any kind, in any location, after the two-year period then you will revert to standard 'in policy' provisions of our LTA Program and the provisions in this Supplementary Agreement will be null and void and of no further force and effect. If there is an international assignment anywhere in the world for year three, the terms and conditions in this Supplementary Agreement shall be void and of no further force and effect, but you may be entitled to 67% of the standard 'in policy' LTA Program (including but not limited to a 67% of the standard 'in policy' LTA Program, housing allowance and COLA) without reference to, or inclusion of, any of the terms in this Supplementary Agreement.  If there is an international assignment anywhere in the world for year four, the terms and conditions in this Supplementary Agreement shall be void and of no further force and effect, but you may be entitled to 33% of the standard 'in policy' LTA Program (including but not limited to a 33% of the standard 'in policy' LTA Program, housing allowance and COLA) without reference to, or inclusion of, any of the terms in this Supplementary Agreement.   Your assignment in London will be of two years' duration.  Credit Suisse does not intend to extend the assignment past the agreed Expiration Date

## 1. Continuing Employment Relationship with Credit Suisse Securities (USA) LLC ("Employer")

Nothing in this Supplementary Agreement nor in the LTA Program shall be construed, or have the effect as construing, any relationship of employer and employee between you and the host.

For the avoidance of any doubt, you will remain an employee of the Employer throughout the period of your Assignment and will remain bound by the terms and conditions of employment as set out in your US employment contract. If the terms of your US employment contract, the LTA Program and the terms of this Supplementary Agreement conflict, the terms of your US employment contract shall prevail.

You will continue to loyally safeguard the legitimate interests of CS to the best of your abilities, and especially, you will remain bound by the strictest confidentiality with regards to any knowledge you may have of transactions pertaining to CS and its clients (business and banking secrecy).

You may be required to undertake induction and/or training programs in your Host location. You will do so promptly and diligently and will comply with Host location directives, policies and procedures of which are you made aware from time to time.

CREDIT SUISSE

For the duration of your Assignment in London your designated home country is New York, New York, USA.

## 2. Base Salary, Allowances and Deductions

Your base salary and allowances (less any deductions) will continue be paid through the US payroll during the course of your Assignment.

Please note that assignment related allowances will not be paid prior to the receipt of a signed copy of this Supplementary Agreement from you, and until any necessary regulatory approvals, work permits/visas are obtained and activated.

Where applicable, a Cost of Living Adjustment, Hypothetical Housing Deduction, as well as various home benefit deductions will be applied to your base salary according to the LTA Program. In addition, a hypothetical tax deduction will be applied to your base salary and Discretionary Variable Incentive Award, if any, according to the LTA Program, if applicable.

### Discretionary Variable Incentive Award (if any)
To ensure full tax and reporting compliance for inter-country transfers, any discretionary variable incentive award relating to the year of transfer will be split into separate payments for each period of service in a country (where the time spent in that country is longer than thirty days). The cash component of any discretionary variable incentive award granted will then be paid through the payroll relevant to that service period. Taxes and social security will be withheld from any portion payable in line with the statutory withholding requirements and any discretionary variable incentive award payments will be fully reported in every jurisdiction where this is required.

You will need to maintain a bank account in both the US and the UK pending payment of any discretionary variable incentive award. The terms, conditions and eligibility for any discretionary variable incentive award are referred to in your employment contract.

### 3. Relocation Provisions

To assist you and your eligible dependents in moving from New York to London, CS will provide the following assistance. Please refer to the LTA Program for further detail, including applicable terms and conditions:

- Immigration assistance
- Relocation Flights: Reimbursement of a direct flight from the home to the host location.
- Shipment of Personal Effects: Sea shipment 750lb container and Air shipment 40ft
- Temporary Accommodation: Up to 10 days pre-departure and 91 days in London (please note that this an exception. 30 days are provided as per the CS policy).
- Destination Services
- Rental Finder's Fees
- Loss on Sale of Automobile/Motorcycle

Page 3 of 11

CREDIT SUISSE

- Lease Termination Fees (only in the case and in so far of duplicate rental)
- Relocation Allowance: CHF 12,500, paid in host currency via the host payroll at the latest CS monthly shredder rate. .
- Dual Career Allowance (if eligible, please refer to IAM)
- Tax Services

## 4. Ongoing Assignment Allowances, Deductions and Provisions

The allowances, deductions and provisions below reflect the temporary nature of the Assignment and are intended to provide financial support while on assignment. Please refer to the LTA Program for further detail, including applicable terms and conditions:

### Housing Contribution

In each assignment location, appropriate housing guidelines are established based on your corporate title and family size. The housing contribution as per the Credit Suisse policies is GBP 197,400 annually/GBP 16,450 monthly, however as an exception your local housing contribution will initially be set at GBP 416,000 annually/GBP 34,667 monthly but will be capped at your actual rental in the host location. Your housing contribution is subject to the prevailing LTA Program in the UK, and as such may be adjusted during the course of your Assignment. Any adjustment to your housing contribution, for example, due to a change in the local housing market table, a change in corporate title, or a change in family size will not be made until your next lease renewal date. CS will be responsible for any tax and employer social security on this contribution, or associated payments.

Please note that CS will be responsible for any tax on this contribution, or associated payments.
Your housing contribution is temporary in nature, and will cease after 2 years, if not cancelled earlier as a result of the termination of your Assignment or employment.

You are discouraged from purchasing your own accommodation in London. Should you do so, all associated costs and potential losses are for your own account and your housing contribution will cease from the date of purchase.

### Cost of Living Adjustment (COLA)

Your COLA has initially been set at USD 25,958 annually (This is reviewed quarterly and will fluctuate). Please refer to the LTA Program for details of how this benefit is applied. CS will be responsible for the tax on this allowance.

### Hypothetical Housing Deduction

From the commencement of your Assignment, you will be required to pay the Employer a hypothetical housing deduction, calculated as a percentage of your base salary. You agree by signing this Supplementary Agreement that this deduction will be deducted directly from your base salary to the extent permitted by law. This deduction represents an assumed home country housing cost. In accordance with the LTA Program, in the event that the full amount of your housing contribution referred to above is not utilized, the hypothetical housing deduction will be reduced in direct proportion to the ratio of the allowable housing contribution utilized. Your hypothetical housing deduction has initially been set at zero annually and must be paid in equal monthly installments by deduction from your base salary. This deduction will cease concurrently with the cessation of your housing contribution. It has been agreed that this will be waived as an exception.

CREDIT SUISSE

### Education

CS will pay the approved local education costs for any of your dependent children residing with you in the Host location from their entry into the host Kindergarten system (not including playgroups and pre-kindergarten) to secondary school completion. CS will be responsible for any tax on this allowance. Please refer to the LTA Program for further details.

### Home Leave

For the duration of your Assignment, you will be entitled to one home leave flight per family member (as defined in the LTA Program) for each full year of your Assignment completed. Please refer to the LTA Program for further information. As an exception, it has been agreed that you are eligible to claim Business Class flights in lieu of the standard policy.

### Storage

If you need to store household goods in your home location, CS will pay storage costs for the period of the Assignment.

Any exceptions to policy, including those outlined above will be reflected on your Year End Compensation Worksheet for this year and future years as applicable.

### 5. Taxation

CS engages the services of a global tax services provider to provide tax compliance services to Long Term Assignees.

### Equalisation

Your Assignment will, from the assignment start date, be covered by CS's Tax Equalisation Program. In principle, it is CS's objective that you pay neither more nor less income tax and social security on your earned income and benefits than you would have paid had you remained resident and working in your home country. Please refer to the LTA Program and the Tax Equalisation Program for further information.

### Tax Consultations

Subject to the terms of the LTA Program, CS will provide the services of a global tax advisor to arrange for a home country pre-assignment consultation and host country arrival consultation. At these meetings, the tax implications of your Assignment will be explained to you and it is your responsibility to ensure that you meet with the tax advisor. Please note that these meetings do not include financial planning advice for which you should engage an outside consultant to assist.

### Tax Return Preparation

An integral part of the tax equalization process is the timely and accurate preparation and filing of tax returns in both home and host locations. CS will pay for its tax advisors to prepare the necessary tax returns for all years in which you receive Assignment income, subject to the terms of the LTA Program. Your tax returns should be filed with the tax authorities in the appropriate jurisdictions (e.g., home and/or host locations) while on Assignment. It is your personal responsibility to co-operate fully with our tax advisors in the timely and accurate preparation and filing of your returns. Any interest and/or penalties that may accrue as a result of your non-compliance will be for your own account.

### 6. Benefits



CREDIT SUISSE

**Social Security**
CS will confirm to you whether you will remain in your home location social security system or not. Any such confirmation will be subject to CS obtaining the necessary Certificate of Coverage.

**Health and Pension Plan**
Where possible, you will maintain your home location health and pension schemes, subject to the terms and conditions of those schemes and as permitted by law. In cases where this is not possible, alternative arrangements will be made by CS with the guidance of its global tax services and benefits advisors.

## 7. Vacation Entitlement, Sick Leave, Work Schedule and Public Holidays

Other than in relation to public and business holidays, you will receive the same vacation and, if applicable, sick leave entitlement as offered in the home location. However, if standards or law in the host location provide for a greater entitlement, you may follow local practice.

## 8. End of Assignment

**Termination**
Your employment with the Employer may be terminated by you or the Employer at any time during the Assignment according to the terms and conditions of your US employment contract. For the avoidance of doubt, your Assignment will end concurrently upon the termination of your employment with the Employer, if it has not already ended.

**Repatriation**
CS will provide repatriation assistance to you and your eligible dependants at the end of your Assignment in accordance with the LTA Program. If you are entitled to repatriation assistance, your IAM representative will work with your HR Business Partner to make the necessary arrangements. Please contact your IAM representative for further details.

**Repayment of Assignment Allowances**
If you terminate your employment relationship with CS during your Assignment, CS reserves the right to require repayment of any payments made under this Supplementary Agreement and the LTA Program on a prorated basis. For the avoidance of doubt, this excludes your base salary. The repayable amount will be reduced by 1/12 for every month worked in the respective year of assignment.

## 9. Legal Issues

**Administration of Personnel Data**
By signing this Supplementary Agreement, you acknowledge and agree that your personal data in relation to your Assignment may be collected, transferred and stored by CS (in both electronic and in physical form) and disclosed in a carefully controlled and confidential manner to the appropriate staff of CS in HR, IAM and other departments as well as authorised third parties on a need to know basis in connection with your Assignment, in each case wherever they may be located globally.

If you do not agree to provide the aforementioned consent to the collection, transfer, storage and disclosure

Page 6 of 11


CREDIT SUISSE

of your personal data, your Assignment may not be able to commence, and you will need to discuss further steps with your IAM representative and your manager.

The secure and confidential treatment of your personal information is a high priority for CS. If you have any questions, please contact your IAM representative.

**Right of Recall**
CS reserves the right to terminate your Assignment and to recall you to your home location or to transfer you to any other CS business location at any time during your Assignment with or without cause.

**Applicable Law and Venue for legal proceedings**
This agreement and any claim, controversy or dispute arising under or related to the agreement, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties will be governed by the laws of the State of New York without regard to any conflicts of laws principles that could result in the application of another jurisdiction's law. You will remain subject to the Credit Suisse United States Employment Dispute Resolution Program, as amended from time to time (the "Program"). The Program provides that all employment-related claims, including all statutory claims, an employee may at any time have are to be resolved through a three-step process consisting of an internal grievance procedure; mediation before an independent service provider; and (in the case in which a claim is not resolved through the first two steps) binding arbitration before one of two independent service providers in accordance with its arbitration rules. Any disputes arising hereunder shall be resolved in accordance with such Program.

Should there be a need for any court proceedings in connection with a mediation or arbitration hereunder, Credit Suisse and you acknowledge and agree that such proceedings shall take place exclusively in the Supreme Court of the State of New York, New York County or in the United States District Court for the Southern District of New York and you irrevocably consent to exclusive personal jurisdiction and venue in such courts.

We are pleased to be able to offer you this Long Term Assignment and we wish you every success.

Yours sincerely,

*Agnes Wraga*

Agnes Wraga
VP - International Assignment Management (IAM)

**For and on behalf of Credit Suisse Securities (USA) LLC**

Date....... 10/4/2012



**CREDIT SUISSE**

### Declaration of Agreement:

The undersigned hereby confirms his/her agreement with the above conditions and acknowledges that he/she has read and understands the Supplementary Agreement and the Long Term Assignment Program in its entirety.

As of
LONDON   OCTOBER 4, 2012            Jamie W.

Place, date                         Signature – Jamie Welch

### Enclosures:
- Long Term Assignment Program
- Tax Equalisation Program

Page 8 of 11


CREDIT SUISSE

## *EMPLOYEE ACKNOWLEDGEMENT OF TAX EQUALISATION OBLIGATION*

Pursuant to Credit Suisse's tax equalisation policy, Credit Suisse is entitled to collect from me the amount of hypothetical tax as computed under the policy. Credit Suisse is responsible for paying only the excess of taxes (including social security) over the computed hypothetical amount. In addition, Credit Suisse may retain the benefit of any income tax (including social security) savings associated with my assignment.

In addition, I agree to pay to Credit Suisse the full value of any and all tax credits available utilised by me within ninety days of the date I filed the applicable tax return(s) to the extent such credits result from the taxes paid on my behalf by Credit Suisse. I further agree to provide to Credit Suisse information relevant to the tax credit, including copies of relevant portions of my tax returns.

Should circumstances prevent me from satisfying my obligations within these prescribed periods (for example, as a result of refunds received late from a taxing authority), I will notify Credit Suisse in writing, describing the circumstances. I understand that providing notice will not release me from my obligations to Credit Suisse. Credit Suisse reserves the right to offer me an adjusted payment schedule in view of the reasons set forth in writing.

Credit Suisse reserves the right to undertake any legal proceedings necessary to collect from the employee any amounts due to Credit Suisse under the terms of this policy but not returned by the employee as acknowledged in agreeing to the terms of the policy.

Furthermore, Credit Suisse will be entitled to deduct any monies due from me in respect of my obligations under this policy from any monies owed to me (including, but not limited to, salary, bonus, holiday pay) whether during or on the termination of the Assignment or my employment.

I agree to settle with Credit Suisse any and all tax equalisation obligations within thirty days of receipt of a final tax equalisation calculation.

I agree that my home location is New York, New York, USA, and that I will be tax equalized to this location (New York City, New York State and US Federal).

As of October 4, 2012

Signature – Jamie Welch                    Date

CREDIT SUISSE 

### Employee Responsibilities Regarding Tax Filing

The following sets out the key matters In respects of UK tax compliance which will apply to you on your relocation to the UK. Please read carefully and sign where indicated.

#### 1. Personal Intentions

You have stated that your personal intention is to be based in the UK for less than two years from your date of arrival. The UK tax position, as advised by PwC, would no longer be applicable should your intention change at any point and a review of the advice provided to date would need to be revised in these circumstances.

It is therefore important that should your personal intentions regarding the length of your stay change, you must immediately inform both Credit Suisse and PwC of this point so that appropriate actions can be taken.

Examples of a change in intention would include the purchase of a property, extending a lease on a rented property, issuing a public statement of intention to remain in the UK for a long period of time and so forth.

#### 2. Record Keeping

For the purposes of UK tax compliance, accurate and comprehensive record keeping of your movements during 365 days of the year is required.

You must keep a record of overseas workdays as they affect your UK tax liability. You should keep a calendar detailing your whereabouts on any particular day and you will also need to record whether this is a workday or non-workday and the type of duties you are performing. HMRC will require an accurate diary of your workdays to review your annual tax return and this information will also be required in the likely event of an official HMRC enquiry.

You should also keep copies of expense reports with tickets, invoices, receipts and other supporting documentation including boarding cards and personal notes and documents that will allow you to reconstruct your itinerary and a broad outline of duties undertaken on any particular day.

#### 3. Bank Account Structuring

It will be possible to claim a tax exemption in the UK on income relating to your overseas non-UK workdays. You should therefore arrange to have your employment income paid into a bank account outside of the UK. You must be able to retain offshore the amount of employment income which relates to the claim for overseas workdays. For example, if you have 50% non- UK workdays, you must retain 50% of your employment income offshore and not remit this into the UK at any time in any year to make a corresponding claim on your UK tax return.

Remittances of funds from your offshore bank account will include the bringing in of money or goods to the UK.

## CREDIT SUISSE

In general a remittance occurs when funds are transferred to the UK from overseas, or offshore funds are enjoyed in the UK, but the term can cover:

- Transferring cash or bank balances to the UK.
- Withdrawing cash from an overseas bank account in the UK.
- Using overseas funds to settle a UK credit card debt.
- Using overseas funds to settle liabilities incurred in the UK.
- Using overseas funds to repay a loan made in the UK.
- Using overseas funds to repay a loan made overseas but brought to the UK.
- Using overseas funds to pay interest on a loan made in the UK.
- Using overseas funds to settle an overseas credit card debt for UK expenditure.
- Bringing to the UK assets which have been purchased overseas.
- Generally, using overseas funds to pay for a service provided in the UK.
- Using offshore funds to service interest on a loan that is used or enjoyed in the UK (except for certain payments of mortgage interest under grandfathering provisions).

You should agree to consult with PwC prior to remitting significant funds from your offshore bank account so that further advice can be provided.

Please sign below confirming your acceptance to the above

As of October 4, 2012

_____          _____
Signature – Jamie Welch                        Date